1, 3, 1, 4, 3, 0, Metzger versus KBR. Whenever council are ready to proceed, we'll get started. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, All right, Ms. Burke, go ahead. May it please the court, my name is Susan Burke, and I represent the service members that were harmed by KBR's misconduct. We're here today to ask this court to overturn the district court opinion. The district court appears to have made a policy determination that he favors, as does Judge Wilkerson on this circuit, he favors tort-free liability in the battlefield, and that any independent contractor who's been hired to assist the military should be immunized from all tort liability, regardless of whether or not the contractor was acting in accord with the military's wishes and the military's directives. The district court came up with three different theories and applied them in a way that was unmoored both from the law and from the facts. I'm going to address each in turn, beginning with the political question, unless your honors would prefer a different order. That's fine. The political question is governed by Supreme Court jurisprudence in Baker v. Carr, and the teaching of the Supreme Court is very clear. You should not invoke the political question doctrine, a separation of powers doctrine, except in those rare instances when leaving the courthouse doors open, two individuals would somehow impinge on the constitutional prerogative of another branch. Here, we're dealing with tort claims. We're dealing with the quintessential function of the judiciary, which is to adjudicate common law tort claims of people that were injured. Well, we were dealing with a tort claim in Taylor, and yet we found the political question doctrine barred that claim. Why is this case different? This case is far different because what the court in Taylor did was appropriately look at a fully developed factual record and ascertain and assess whether permitting a common law tort claim to go forward would unduly burden the military decision making. And what the court found there— Well, I thought it would result in questioning the wisdom of military decisions. Your Honor, that is correct. And it was an actual decision at issue, a decision by the military about whether or not to put a generator on a particular place. What about the decision here to use burn pits in combat? Well, in Taylor, the decision came about because the defendants could properly invoke contributory negligence. They could say that the plaintiff was contributory negligent due to the decision on the generator. Here, the decision to use burn pits does not provide a defense of contributory negligence. But doesn't it at least implicate issues of causation? The reality is that the military has the power and made the decision on whether or not to use burn pits. In fact, if you look at the DOD report that's in 2313 to 2317 in the Joint Appendix, what you'll see is what the DOD said. While log cap contractors may operate burn pits at larger U.S. bases in Iraq and Afghanistan, the majority of burn pits are operated by troops. Detail to the task, as log cap does not service all bases. So without doubt, the military, on occasion, had that they themselves operated burn pits. And on occasion, they gave the log cap contractor, KBR, permission to operate burn pits. Well, at this point, we don't know which state law applies, do we? Well, we do not. And we also, at this point, which would lead to the next question, is we don't know whether there's going to be proportional liability yet. You're right, Your Honor. This is why the dismissal is premature, because we don't even know whether there's going to be a factual basis to invoke contributory negligence or any kind of apportionment defenses. What we do know is that although KBR has had years to do it, they have not come forward with military authorizations to use burn pits. Rather, they speculate that because the military authorized burn pits for itself in the forward operating bases, and on one location, Camp Taji authorized burn pits for a particular point in time, that somehow we should just ignore the lack of a factual record and assume that there's been military authorization to operate burn pits at all the large bases. And if there was, your point is that even that doesn't answer the question finally, right? Correct, because the claims that are raised are raised because of the injuries suffered. It may well be that the military authorized the use of a burn pit at a particular base, but put the restrictions on that we've seen at all of the burn pits, no burning of medical waste. If we are able to establish, and we have submitted declarations from KBR employees as well as from military officials, if we are able to establish that even in those instances when they were authorized to use surface burning, they were not authorized to burn medical waste, other types of substances that were known to cause serious harm, we would then have an argument, prove up the causation, the reason these people were injured was because even with permission to surface burn, they violated that and they burned things that they shouldn't have burned. But as Judge Floyd pointed out, it would depend on what, if we agree with the Harris analysis, it would depend on what state law applies, because if you're dealing with proportionate liability, invariably, even in that scenario, you're going to have to get into questioning the wisdom of whether or not burn pits should have been appropriate at all. Well, you only get into the wisdom of questioning whether surface burning should be permitted if the allegation of the harm is that it was the permissible surface burning. If what you're talking about is instances which we have in which KBR, although they accepted more than a billion dollars a year, just violated and did not follow the military directives, and you can prove that the harm arose from their violations of the military directives, you get nowhere near a political question. You get nowhere near assessing the wisdom of a military judgment. Yeah, well, I guess that's possible. I'm not sure how that's going to play out. Well, and Your Honor, the district court's original decision recognized that this is exactly why you cannot make these type of decisions, whether or not the political question applies. You can't make them in the abstract, and you can't make those calls based on vague generalities. I guess the other concern I have is the way the opinion sort of melds the two issues in this case. You have a burn pit claim and a water claim. The district court, it seemed, just sort of lumped them all together and said that because the military had authorized burn pits, that somehow that affected the legitimacy of the water claim, which is something entirely different. That's correct, Your Honor. It is entirely different. And what we allege there is that KBR provided the troops with, they provided contaminated water. That was not permitted. There was no oversight. There was no supervision that caught that. There's a record of deceit and fraud about that, and it caused harm to people. And whether or not the military decided in its own judgment that at short operating basis some surface burning should occur has nothing to do with whether or not KBR should have been allowed to harm people by providing the contaminated water. So the decision is replete with errors and needs to be overturned. What's interesting is that the district court did not rely just on political question, but rather went even further, throwing his lot in with this notion that there just should never be any sort of liability for independent contractors who accompany the force. He claims that- Well, but isn't that now the position of the government, except with respect to torture claims? No, Your Honor, it is not. First, you have to look at, if you look at the sequence of the three briefs that have filed by the U.S., there is clearly a struggle and an evolving effort to grapple with what should be the appropriate doctrine to govern these types of cases. And they've changed over time, and they've come up with different theories. But what they have not done, which is what they're able to do, which is weigh in directly with a statement of interest and say that in this case, with this multidistrict litigation, with all of these different people harmed, we believe this case should be dismissed. They haven't done that. Rather, what they did in Al-Shamari is put in a brief saying, well, we think that the doctrine should be expanded, and we're generally comfortable with immunizing contractors on the battlefield, but not in this case, but not with respect to torture claims. Now, the case law says you can't read an amicus brief on one case as controlling what the government's position is going to be on the other case. So if we really want to look at what the executive branch, what the DOD position is, let's look at the regulations. What do the regulations say? The regulations say we are not going to eliminate tort liability for independent contractors. There is a federal interest, an executive interest in ensuring that the normal operation of the law continues to operate. It protects the government from contractors like KBR who take advantage of the fog of war and cheat and lie. Well, the regulation is fine, but if it conflates with a statute that immunizes these kinds of acts, aren't we stuck with the statute? We have no such statute. Well, they say the Federal Tort Claims Act. But by its very terms, and I would suggest a rereading of the Garland dissent and the Salah decision. If you read the Federal Tort Claims Act, by its very terms, it excludes independent contractors from its scope. The Federal Tort Claims Act is a waiver of sovereign immunity. It does not say anything about waiver of corporate liability. And that law was passed after World War II when Congress was well aware of the fact that contractors were used on the battlefield. No such immunity was granted. In the ensuing years, the defense industry has gone again and again to Congress trying to get that very immunity, asking that they be given complete immunity from liability on the battlefield. Congress has never granted them that. So I would take it that you would not like to use a Solicitor General's test, but rather use Salah's test. Well, not the Salah test. What should control here is the statute and the Supreme Court jurisprudence. If you want to look at whether or not an independent contractor like KBR should be removed from liability, should be protected from liability, look at the Boyle decision. The Boyle decision says there are instances when it furthers federal interests to protect corporations from liability. They are very narrow. And the first thing that you need to do if you're going to decide to extend that type of liability protection is you have to identify a significant conflict between the duty imposed by the federal government on the contractor and the duty imposed by state law. And if the evidence turns out to be that the military authorized the use of burn pits across a wide swath of bases in both combat zones, that would implicate this discretionary function exemption under the FTCA and Boyle might theoretically apply. Is that fair? Yes, Your Honor. If you apply the Boyle test and you say, all right, we're going to look at whether or not KBR is able to comply with its state law duties of care as well as the federal directives, the military directives, and the terms of the contract, you would look at whether or not KBR abided by the terms of the contract. Or directives given. Or directives given. Exactly. And so we have one of those instances that actually does not even invoke Boyle because a compliant contractor is not going to have caused these harms. A compliant contractor- Well, he might have, but the military authorized it, right? And that's not our allegation, sir. What we're alleging is that the harm is flowing from the malfeasance. The harm is flowing from the failure to follow the military directives. And so what you have is a situation in which compliance with the contract terms, compliance with military directives, is completely consistent with the state law duties. And so there is no significant conflict. There's no need to extend any sort of immunity or protection from liability in this particular instance. Ms. Burke, if we agree with you, what would you have us direct the district court to do? You would remand and you would direct the case to proceed so that there would be discovery on these pivotal factual issues. Are there military directives in KBR's files that gave them permission to use surface burning the places they use surface burning? We don't think there are. They've only come up with one at Camp Taji. So, you know, that obviously we need to know. We don't need discovery from the military. We need discovery from KBR's files. You claim you're authorized. You claim you're following a military directive. Show it to us. And so we need discovery. And this is one of those cases in which that will sort out a large segment of the case. We need to know which burn pits they've operated and what their permissions were. All right. Thank you, Ms. Burke. Thank you. Mr. Matthews. May it please the court. Good morning, Your Honors. Robert Matthews with my colleague Daniel Russell on behalf of the KBR parties. In listening to counsel's arguments, I feel like we're addressing two different sets of issues. The issue that I think is before this court addresses threshold jurisdictional questions of whether the court is competent to hear the claims against KBR. And embedded in those threshold issues are paramount federal interests, because this is a challenge to the question of who regulates conduct on the battlefield. This is a challenge to the federal interests that will be harmed if we now substitute the judiciary for the executive branch and the military in controlling battlefield functions. At risk is creating a new battlefield normal, where commanders on the battlefield and their contractors are going to now have to pause to consider the state tort law standards, indeed 50 state tort law standards. I would submit that that would create the ultimate in unintended and unwanted but predictable consequences, which is creation of a litigation-sensitive military command. Plaintiffs have essentially challenged the methods chosen by military professionals for delivering combat decisions, logistical support decisions, and mission-critical decisions. Actually, what you're saying is they don't know whether the military actually authorized and made the very decisions that you assume apparently were made on this record. Well, I think the record below is actually quite clear on that point. I think Judge Titus has made jurisdictional findings of fact, and it relates back to the Taylor decision. He applied the Taylor factors. The Taylor court, this court, took the six Baker factors and distilled them to two factors for purposes of the combat contract and the battlefield cases, such as Taylor and such as this case. And it said, look for two things. The discriminating inquiry focuses on two inquiries. One, whether the military exercised plenary control. And if it did, then the Taylor court said that you can consider the contractor's decisions as de facto military decisions. And then secondly, it said, look to determine whether national defense interests are implicated in the decisions made by the military that directed the contractor's conduct. Judge Titus addressed both of those. And coming back to the question that you're posing, Judge Diaz, he said that it is clear that the military selected the methods. KBR, the use of the burn pits was dictated. He actually said, coming back to the water. So, and what is the evidence to support that? Other than these general declarations that burn pits were authorized on the battlefield. But it doesn't really, that really doesn't help us because it doesn't specify, you know, individually with respect to each camp, whether or not that was authorized. Well, do we need to burrow down that far? I don't think so, Your Honor, because I think in fact it does. Judge Titus concluded correctly from that record. And these were seven senior military personnel who were in the health and safety arena. They had this responsibility. And the record was a statement by General Petraeus to Congress saying, we continue to need burn pits.  The GAO report and DOD report, both in the record, which both address the burn pit issues, call them the burn pit problems, but concluded that the decision to use burn pits is retained at operational command level. So I don't think you need a piece of paper in the course of a war of invasion, insurgency, surges, and so on. I don't think the search for a piece of paper is needed to conclude as Judge Titus did on that substantial record. The military, in fact, made those decisions. I'd invite the court to think of it the other way around. The concept that on a forward operating base, these small islands scattered across the asymmetric battlefields of Iraq and Afghanistan over the course of a decade, no front lines, no safe and static bases. The notion that the contractor would dictate to the military, we've decided we're going to use a burn pit. What if they did things in connection with those pits that the army or the military didn't authorize? Well, the question of authorization seems to me is semantic. It seems to me that the word authorization is just another way of saying, as alleged, at least, that KBR was negligent. And plaintiff's position is essentially that this court has jurisdiction to resolve the merits of the allegations of negligence unless and until KBR demonstrates that it was compliant. That turns the political question doctrine upside down. That is not what the Taylor Court said. The Taylor Court said, look for those two factors. And I'd add to that the causation factor that was mentioned. Because these military decisions, and it goes beyond the use and the location, it goes to the question of who conducted the testing in theater. Well, that was the military's responsibility. They tested the air emissions with respect to burn pits. They concluded that burn pits didn't present health problems to the troops. Now, more recently, those conclusions have been called into question. But at the time, it sent out bulletins to its soldiers and to the contractors. There were no health risks associated with burn pits. So again, the military is controlling these decisions. They are embedded in the performance of these services by KBR. They're inextricable in any litigation that goes forward that KBR would say, you're alleging we were negligent. We were doing what the military directed us to do. And Judge Floyd, just coming back to your point, if there are allegations of negligence, that is not the inquiry under the political question doctrine. The political question doctrine asks whether this court is competent to review, examine, probe, and second-guess military decisions. And they are so embedded in this case, it would be impossible to extricate one set of factors, the military decisions, from performance by KBR. Well, I don't know about that. I mean, you say that as a general proposition, there was this broad swath of authorization. But what if, in a particular instance, there was no such authorization? And even if there was, the contractor never had any authority to burn the types of materials that they ended up burning. Why isn't that a legitimate claim to be assessed by the courts? Because, as the Taylor Court concluded, essentially assume negligence. It won't matter. It still will impact, implicate national defense interest issues. The court cannot navigate, a trial court could not navigate, through all of those allegations of negligence, and at the same time, avoid the political questions that are embedded, the points that I have made. There's a series of other ones as well. The military moved living and working quarters closer to the burn pits as the bases grew. I mean, there are a number of issues. The military, and I think the record reflects this, they were the ones that decided to burn plastic water bottles, an allegation of negligence. The record concludes, Judge Titus concluded, that was a military decision. So, I do think that, well, let me ask you about the water. What was it that the military authorized, and what level of detail did they have, with respect to the actual implementation of the processing of water? Let me be clear about a couple of things. First of all, we're not talking about drinking water. The drinking water in the theater was plastic water bottles. That's why there was a plastic water bottle problem. This is non-potable water. Secondly, Judge Titus did address this issue. It's in the joint appendix at 3726. He relied in part on the declarations from several of these, of the seven senior declarants, two, maybe three of them addressed the water issues at length, described the military's oversight and responsibility and control over the production and testing of water in theater. And again, what plaintiffs are alleging, and I understand that it's not as clear in the record, and that's because the allegations aren't as clear, but at the end of the day, it reduces down to an allegation that you didn't do it right. You should have performed these services in a compliant fashion, not in a non-compliant fashion. Whatever they may mean by that, it still comes down to negligence. And those are issues which this court, any court, is not competent to review because underlying those decisions are military judgments made on the battlefield, respecting war exigencies, realities and risks of the battlefield. Well, the Harris court came to a different conclusion based in part on, I guess you would argue, slicing the loaf very thinly. But why is that wrong? I mean, why should a court simply accede and throw up its hands up and look at the question, that's the end of it? Well, I would invite the court to consider this sort of on the big picture and on the smaller slicing picture, if you will. This is the political question doctrine. This is a question about the competence of the court. But it's also a question about the obligation of the courts to resolve cases and controversies. And we should not see that all that easily. I mean, military judgment, just because someone's in the military, it doesn't mean that they're completely immune from being considered with respect to issues in court. Understood and agreed, Your Honor. Let me address blanket immunity, if I may,  All right. Harris cannot be reconciled with Taylor. Taylor Court said, in contractor on the battlefield cases, there are two factors that should be looked at, the control factor and the national defense interest factor. The Harris Court never mentioned the national defense interest factor. And why that is so critical is that it is in that national defense interest analysis of whether the military decisions govern the manner of performance by the contractor. Therein arises the political questions. So it's not consistent with Taylor in that regard. But here's an even more startling conflict. Both the Taylor Court and the Harris Court reached the conclusion that there was sufficient evidence in the record to enable KBR to argue that the military decisions played a causal role in the alleged injuries of those plaintiffs. When the Taylor Court reached that conclusion, it said essentially, full stop. You cannot go beyond that point. That is jurisdictionally dispositive because political questions inevitably will arise. The Harris Court said, no, political questions won't necessarily arise. I cannot reconcile. I don't think those two opinions can be reconciled. And I believe that the Taylor Court in this jurisdiction controls and therefore the Harris decision is simply wrong. Let me give you two other reasons why I think it's wrong. First, it doesn't reflect the realities of litigation. Litigation, as your honors know, doesn't get segmented into this piece and another piece over here, as if they don't interact. Throughout litigation on these claims, the decisions made by the military will be inextricably intertwined with the arguments on the merits. You cannot separate them. And it is just simply an artifice to suggest that they can. And if I may, your honor, let me step back and say, I mentioned a big picture, look at this. We're talking about justiciability, a constitutional barrier to a court considering these cases. The notion that the vagaries of 50 different state laws would be outcome determinative with respect to the application of that constitutional issue simply enjoys neither precedential support nor logical support. This court in Taylor did not consider the choice of law in the context of determining whether the political question would arise. There is language in the opinion on contributory negligence, but contributory negligence is not what caused the court to arrive at the conclusion that the political question doctrine barred that claim. It was the recognition that the failure to provide backup power was going to be a defense by KBR in that case and that that raised political questions. And so in the same respect here, KBR will assert that those military decisions that I've been referring to played a causal role and that will inevitably lead to political questions arise. Simply making the assertion without more, I mean, the court is entitled to test that assertion and that's what happened in Taylor. The court arrived at a determination that there was in fact a legitimate concern with respect to contributory negligence, which would in turn impact and require a court to assess the wisdom of the camp commander's decisions with respect to electrical power on that base. So that's a fairly, that's a well-considered judgment. But here, I mean, the court, the district court simply seemed to swept with a broad stroke and said, that's a political question, that's the end of it. And to follow up on that. Yes. Suppose this case lands in a state where it's joint and several liability, where they could get full relief from KBR without having to evaluate the military decision. Yes, and that was, I think, the Harris court was focusing on that possibility, but I would go back to the point I made a minute ago about the realities of litigation. Because I think the false assumption in that analysis is that the case would go in differently by the defendant in a state that applies a joint several liability standard, as opposed to a state that applies a comparative law standard. That's simply not the reality of litigation. KBR will put the case in the same way. It will call for deposition and trial testimony, scores of military witnesses to confirm if put to the test on a base-by-base basis, that which has already been established in the record. But if we're going to trial, that will be an enormous burden placed on the military. Only if the district court allows it. If it's not relevant, why would it matter? Well, Your Honor, with respect, how could it not be relevant as to the allegation that KBR was not authorized? How could it not be relevant that the very military officials who occupied the base command and other key positions in theater at these forward operating bases, how could it not be? All right, so your point is that Harris, even in dissecting the case along proportionate liability, joint and several liability, invariably these same issues are going to come up in either context. Indeed, and I still think that the bigger picture issue here is that this is a constitutional justiciability issue and the vagaries of state law really should not apply. I'd like to make one last point on political question and seeing our light turn, I'd like to get to the other two bases for dismissal. That's this issue of discovery and the court should have permitted discovery. And I would say to this court that at this stage of the proceedings, discovery is not the issue. The merits are not the issue, but neither is vindicating a litigant's rights through discovery. The issue is the record. The issue is the sufficiency of the record for purposes of resolving the jurisdictionally dispositive question of whether political questions inevitably will arise. That is exactly what Judge Titus did. He conducted the discriminating inquiry that Taylor said he should conduct. He looked at the control issue. He looked at the national defense interest issues and he looked at the causation issues and he concluded with respect to each of those issues that the record supported the application of the political question doctrine because political questions inevitably will arise. And then he made one other finding about that that's absolutely relevant on the discovery issue. He said, it's inevitable. It's embedded. It's inextricable. And therefore no discovery is going to change that outcome. So his conclusion was, I wouldn't be abusing my discretion if I allowed discovery, if I imposed on the military at whatever level because it won't change the outcome. Political question doctrine bars these claims. That was a conclusion that he reached based on the jurisdictional findings of fact which meet the clear error standard and he did not abuse his discretion on the discovery issue. Well, he reached a contrary conclusion early on in the case. He found the political question doctrine did not apply and Baker has been in the law for a long, long time. I guess the only thing that's changed was Taylor and Al-Shamari in those cases. They're not insignificant, but I wonder about that. Well, those are landscape changing decisions. He had the Filarski decision in front of him, but I think it's also important to recognize the record changed. What was not in the record the first time around was the contract itself. What was not in the record the first time around was the GAO report. So you have substantial additional record documents which he cited to, but you also, if you go back and read his opinion and read his for staying the case, staying discovery and waiting on resolution of these Fourth Circuit cases, you see Judge Titus wondering about his initial decision and saying, you know what? I'm just putting this down. I'm not sure. That's what comes out in those decisions. I didn't love everything he said in those first opinions, but I understood what he was saying. Let's wait and see where the Fourth Circuit goes and I think it is controlling and dictating. It is controlling law in this circuit. If I may, your honors, I'll turn to derivative sovereign immunity and submit that this is as strong and compelling a case for application of derivative sovereign immunity as this court is likely to encounter. KBR was performing delegated functions, these battlefield waste and water services. Importantly, that the military itself was also performing using the same methods at the same time for which the United States is immune. Plaintiffs have agreed that Yearly is the right framework and all of the factors under Yearly are in place. They, of course, dispute the scope issue. They would argue that allegations of negligence take you outside of scope. That is not what this circuit has held. Negligence doesn't go to the scope issue. Function goes to the scope issue. The allegations of the complaint are that KBR performed delegated government functions and if I were to stop the sentence there, I'd say, okay, there's the function. We're within the derivative sovereign immunity test. But they add the word negligently and think somehow that changes the outcome on scope. It doesn't. So I think this is a very strong case. The Mangold case said there is a public interest here in efficient government and now we're talking about efficient battlefield government. I think that's a strong public interest argument. And finally, of course, Filarski said, and I think it applies here, that given that KBR was performing these functions on the battlefield in support of our troops, KBR should really not be left holding the bag in this case. So if that applies, does the FTCA then kick in to waive that immunity if we agree with Ms. Burke that the contractors aren't covered by the act? Or is that a separate? Well, addressing the combatant activities preemption argument, which I think is in fact our third argument. Indeed, I think the United States has it right in that regard. The conflict here, and there is a clear conflict, is the potential imposition of state tort law liability displacing the military's exclusive constitutional authority for managing the war effort. And that argument by the United States resounded, I thought, with the judges who addressed the merits of the case, as opposed to the procedural case in Al-Shammari. And I think as applied here, clearly leads to the conclusion that this case should be dismissed on the basis of that preemption. I mean, Congress could have revised, modified the statute to make it clear. It's not clear. Well, I would just say in regards to that argument, it's not in, you're talking about the Federal Tort Claims Act? It could, but with respect to the regulation argument, it was preamble language. It's not in the regulation. Taylor followed it. Al-Shammari followed it. I don't think that this is about regulations. I think that the combatant activities exception is a broader exception than the discretionary function exception. The very notion that there is a Boyle case means that it can be applied under appropriate circumstances to contractors on the battlefield. And that's what this court did in Taylor. I think the precedent in this circuit supports the conclusion that these claims are preempted. Do you have anything else? All right, thank you, Mr. Chairman. Thank you, Your Honor. Ms. Burke, why did Taylor control it in this case? Taylor was an appropriate application of the political question doctrine after the facts had been ascertained. And Taylor, as you see with other circuits, in the Fifth Circuit, the 11th, the 3rd, it is possible for the judiciary to make inquiries, to ascertain the scope of military decision-making, the scope of sensitive military judgments, and to craft solutions and to invoke the doctrine when necessary to insulate sensitive military judgments from judicial scrutiny. We don't have that here. And my colleague suggested that it is impossible for courts to even walk that path. And yet you look at the Lane case, the McMahon case, the Carmichael case, the Bixby case, the Harris case, time and time again, the judiciary says, we're not gonna toss anything that happened over in Iraq and Afghanistan. We're not gonna shut the courthouse doors to anyone who was harmed over there by corporate negligence. We're, instead, we're gonna follow the teachings of the Supreme Court. We're gonna make a discriminating inquiry into the facts to ascertain whether or not letting the case go to the jury would somehow adjudicate the wisdom of a sensitive military decision. These cases can go to a jury without adjudicating the wisdom of any sensitive military judgments. But Mr. Matthews says that Harris is just far too discriminating. It burrows down too far. Invariably, we're gonna get involved in assessing the wisdom of military decisions. That is an overstatement and a generality. And that's the problem with his argument, as well as with what the district court did. We have a, there is a federal interest in permitting state law, state to protect their own citizens. And you do not lightly close the courthouse doors to tort claims. The 50 states that sent service members over to defend our nations, they wanna make sure that their citizens aren't harmed by corporate malfeasance. And there's no, that is the constitutional structure. That's the constitutional setup. So the presumption should be, you need to adjudicate tort claims brought by injured citizens. The only reason, in those rare cases, when it's impossible to do that without adjudicating a battlefield decision, if you had to adjudicate whether the military made the right call on that bombing, then we say, all right, then we've got a countervailing federal interest that is going to have, that is going to shut the courthouse doors. You cannot do that with a broad sweep and say, these many of hundreds of people harmed at different locations under different circumstances, we're just gonna slam the courthouse door shut on all of them because we don't wanna figure out which of their claims might actually implicate a sensitive military judgment and which have nothing to do with that. And so it is clear that the district court was not actually guided by and looking to the development of the fourth circuit law. The fourth circuit law would not have led him to be citing repeatedly a dissent. The district court clearly made a policy judgment that he wished Judge Wilkerson's view on complete immunity for contractors accompanying the force had somehow prevailed. It didn't. What is the law of this circuit as well as Supreme Court controlling law is that you do not shut the courthouse doors lightly. There's an obligation to adjudicate. And I would point out that this notion that somehow the record changed and that the court made these factual findings, not accurate. The record changed in a sense in our favor, we added additional declarations from military officials with firsthand knowledge and our military declarations were vetted by the Department of Defense in the same manner that their declarations were. And if you look at Colonel Caldwell, 29-year army at JA 3554 to 3556, he swears under oath, no military control or supervision, no military authorization, that he was powerless to protect the health and well-being. And he just watched as there was this KBR malfeasance. With respect to burn pits and water? With respect to burn pits at the sites where he was located. We had a Navy Lieutenant Commander Olsen, JA 1786 to 88. He said in his declaration, originally this was a forward operating base. The Marines were running the burn pit. They were doing it properly. They were sorting and they were segregating. They were burning at certain times and so forth. KBR came in, violated all of those directives. They had been permitted to use surface burning, but they weren't supposed to burn certain types of waste. They ignored that. They did what was completely prohibited. And that's at JA 1786 to 88. We have a Marine also testifying at JA 1842 to 43. We have another member of the army who had written a contemporaneous memo at JA 1863 to 67. There is no resolution of these disputes. The vague and general declarations that have been put in by KBR are the military officials who volunteered to provide declarations to KBR. The most they would say was nothing was brought to our attention and we didn't see anything. Ms. Burke, how does Filarski change the landscape if at all in this case? Filarski actually establishes quite clearly by its own words that KBR does not enjoy any sort of absolute immunity. Filarski says that there are circumstances that foreclose claims of immunity. Private firm systematically organized to assume a major lengthy administrative task with limited direct supervision by the government, undertaking that task for profit and potentially in competition with other firms. Precisely the case we have here, Richardson controls, not Filarski, because Filarski spoke to the other side of the pendulum, a private individual who would be directly impacted. So you read the Filarski decision and it compels only one conclusion. KBR falls into the Richardson strand of independent contractors, large corporations that are operating outside of government control. No derivative sovereign immunity. In addition, derivative sovereign immunity, the touchstone has got to be the public interest. You can't invoke yearsly unless you can establish that what you were doing was what the government asked you to do. Here, we have put in from KBR's corporate environmental manager, KBR's quality assurance manager, the burn pit operators, KBR auditors, their safety supervisors, as well as other workers. We put in declarations that said KBR was not following what the government told us to do. We were actively cheating and hiding our conduct from the government. Excuse me. And I have those JA sites if needed. All right, Ms. Burke, your time is up. Thank you for your report. All right, we're going to take a brief recess before we hear our next two cases. We'll come down and greet counsel.
judges: Albert Diaz, Henry F. Floyd, Joseph F. Anderson, Jr.